# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED INTERNATIONAL INSURANCE COMPANY, | |
| Plaintiff, | Case No. |
| v. | |
| BANK OF NOVA SCOTIA, NEW YORK AGENCY; BMO CAPITAL MARKETS CORP.; BNP PARIBAS SECURITIES CORP.; BARCLAYS CAPITAL INC.; CANTOR FITZGERALD & CO.; CITIGROUP GLOBAL MARKETS INC.; COMMERZ MARKETS LLC; CREDIT SUISSE SECURITIES (USA) LLC; DAIWA CAPITAL MARKETS AMERICA INC.; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO.; HSBC SECURITIES (USA) INC.; JEFFERIES LLC; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MIZUHO SECURITIES USA INC.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; RBS SECURITIES INC.; SG AMERICAS SECURITIES, LLC; TD SECURITIES (USA) LLC; and UBS SECURITIES LLC, | CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff United International Insurance Company ("United International"), on behalf of itself and all others similarly situated, brings this class action for violations of the Sherman Act, Clayton Act, Commodity Exchange Act, and state common law against Defendants, each of which is or was a Primary Dealer (as defined *infra* at ¶ 3) in Treasury Securities (as defined *infra* at ¶ 1) during January 1, 2007 through the present, inclusive (the "Class Period"). Plaintiff alleges, based upon counsel's investigation and upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This antitrust and commodities class action arises from Defendants' collusion in auctions of U.S. Treasury securities ("Treasury Securities"), along with derivative financial products related to Treasury Securities, such as futures and options (together with Treasury Securities, "Treasury Instruments").  Treasury Securities are debt instruments issued by the U.S. Treasury Department ("Treasury Department"), which regularly borrows to help finance the debt of the U.S. federal government.   Approximately two-thirds of the U.S. government's debt is held in Treasury Securities.   As of June 2015, the Treasury Securities market was estimated to be $12.5 trillion.   On any given day approximately $500 billion in Treasury Securities change hands.   Treasury Securities are a bedrock of the U.S. financial system: their sales raise money to fund the Government, and the rates attached to their sales affect a range of borrowing costs, including home mortgages, auto loans, credit cards, corporate bonds, and state and local bonds.   Treasury Securities are also considered to be the most easily traded and trusted debt in the world; indeed, foreign countries convert trillions of dollars of cash into Treasury Securities every year.

2.      Treasury Securities are sold at regular auctions, for which all relevant information—for example, the amount of Treasury Securities to be sold, the issue or reissuance

date, the maturity date, the terms and conditions of the offering, the customers eligible to participate, and bidding close times—is announced several days in advance.  In the days before an auction, a Primary Dealer that plans to purchase Treasury Securities at the auction may sell Treasury Securities to its customers, and the Primary Dealer may then buy at the auction to cover these sales, pocketing the difference in sale and purchase price, or spread, as profit.  Trading activity during this period, along with the days between the close of the auction and issuance of Treasury Securities, is known as the "when-issued market."

3.      Competitive bids in Treasury Securities auctions are generally submitted by the select group of large financial institutions that the Federal Reserve Bank of New York (the "FRBNY") has designated as trading counterparties ("Primary Dealers").  Primary Dealers are either (i) U.S.-chartered banks (commercial banks, thrifts, national banks, or state banks) subject to official supervision by bank supervisors or (ii) broker-dealers registered with and supervised by the U.S. Securities and Exchange Commission ("SEC").  Each and every Defendant in this action is, or was during the Class Period, a Primary Dealer.

4.      Primary Dealers are the largest group of purchasers at Treasury Securities auctions, and they are the only parties required to participate in all such auctions and to make reasonable markets for the FRBNY.  Many of the Treasury Securities bought by Primary Dealers at auctions will later be sold and resold on the secondary market to companies, banks, other dealers, and individuals.  As Primary Dealers, Defendants thus collectively occupy a unique position in the world's financial markets and have voluntarily assumed a special obligation with respect to the implementation of U.S. monetary policy.

5.      Defendants, however, repeatedly abused their position by colluding to manipulate auctions of Treasury Securities and pricing of Treasury Securities during the when-

issued market.  In a truly competitive market for Treasury Securities, prices of Treasury Securities are generally lower in the when-issued market than at auction.  By exchanging confidential customer information, however, Defendants were able to coordinate their trading strategies; (i) first to artificially inflate prices of Treasury Securities they sold to customers in the when-issued market; and (ii) subsequently to manipulate Treasury auction bidding to artificially deflate the prices at which they purchased Treasury Securities to cover orders placed pre-auction in the when-issued market.  Part of this collusion was agreed upon through the very communication methods that conspirators, including many of the Primary Dealers, exploited for colluding to manipulate other financial markets and benchmarks, including foreign exchange, the London InterBank Offered Rate ("LIBOR"), and the leading benchmark for fixed rates on interest-rate derivatives and swaps worldwide ("ISDAFIX").  These communication methods, including, without limitation, instant messaging, electronic chatrooms, and telephonic methods, were difficult to track and trace.  Consequently, Defendants were able to maximize, through collusion and at expense of the Class, their own profits.

6.     Moreover, this collusion necessarily affected the prices of other Treasury Instruments—*e.g.*, futures and options—thereby harming still more investors.

7.     Recently, on or around June 8, 2015, the media reported that the Department of Justice's ("DOJ") Antitrust Division was probing Primary Dealers for potential collusion in setting prices for Treasury Securities, including whether information was being shared improperly in submitting competitive bids.  The DOJ Antitrust Division has already contacted at least three banks.

8.     Indeed, the spate of recent investigations, settlements and guilty pleas involving various Defendants' roles in similarly colluding to manipulate other financial markets and

benchmarks, including foreign exchange, LIBOR and ISDAFIX, illustrates that Defendants possess both the requisite ethical disregard and financial sophistication to have engaged in systemic manipulation of the market for Treasury Securities.

9.      Plaintiff brings this action for claims arising under the federal antitrust and commodities laws to recover damages, injunctive relief, and other relief for the substantial injuries it and others similarly situated have sustained as a result of Defendants' unlawful conduct to restrain competition in the market for Treasury Instruments in the United States during the Class Period.

## JURISDICTION AND VENUE

10.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, and Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, and seeks to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries Plaintiff and the Class sustained by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 1 of the Sherman Act, 15 U.S.C. § 1, and Title 28, United States Code, Sections 1331 and 1337.

12.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §§1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

13.     This Court has *in personam* jurisdiction over each Defendant because each

Defendant, either directly or through the ownership and/or control of its United States subsidiaries, did the following: (a) transacted business in the United States, including in this District; (b) had substantial aggregate contacts with the United States as a whole, including in this District; (c) was engaged in a price-fixing conspiracy that had an effect on commerce in the United States, including in this District; or (d) purposefully availed itself of the laws of the United States.

14.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**PARTIES**

**Plaintiff**

15.     Plaintiff United International is a New York company with a business address at 444 Madison Avenue, New York, New York 10022.  United International directly transacted in Treasury Instruments with one or more of the Defendants during the Class Period.  As a direct and proximate result of Defendants' collusive and manipulative activities, United International was injured in its business or property.

**Defendants**

16.     Defendant Bank of Nova Scotia, New York Agency ("BNS") is a New York-based branch of a Canadian financial services and banking company with its principal place of business at 250 Vesey Street, New York, New York 10080. BNS is a registered primary dealer for Treasury Securities with the Federal Reserve Bank of New York ("FRBNY").

17.     Defendant BMO Capital Markets Corp. ("BMO") is a New York-based financial services and banking company with its principal place of business at 3 Times Square, 28th

Floor, New York, New York 10036. BMO operates as a subsidiary of BMO Financial Corp. BMO is a registered primary dealer for Treasury Securities with the FRBNY.

18.     Defendant BNP Paribas Securities Corp. ("BNP") is a New York-based financial services company with its principal place of business at 787 Seventh Avenue, New York, New York 10019. BNP operates as a subsidiary of BNP Paribas North America Inc. BNP is a registered primary dealer for Treasury Securities with the FRBNY.

19.     Defendant Barclays Capital Inc. ("Barclays") is a New York-based financial services company with its principal place of business at 745 Seventh Avenue, New York, New York 10019. Barclays operates as a subsidiary of Barclays Group US, Inc. Barclays is a registered primary dealer for Treasury Securities with the FRBNY.

20.     Defendant Cantor Fitzgerald & Co. ("Cantor") is a New York-based financial services company with its principal place of business at 499 Park Avenue, New York, New York 10022. Cantor operates as a subsidiary of Cantor Fitzgerald LP. Cantor is a registered primary dealer for Treasury Securities with the FRBNY.

21.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York-based financial services company with its principal place of business at 390-388 Greenwich Street, New York, New York 10013. Citigroup operates as a subsidiary of Citigroup Financial Products Inc. Citigroup is a registered primary dealer for Treasury Securities with the FRBNY.

22.     Defendant Commerz Markets LLC ("Commerz") is a Delaware limited liability company with its principal place of business located at 2 World Financial Center, New York, New York 10281.  Commerz was formerly known as Dresdner Kleinwort Securities LLC.  As a result of the acquisition of Dresdner Kleinwort Securities LLC by Commerzbank AG, the company's name was changed in April 2010.   During the Class Period, Commerz's

predecessor-in-interest Dresdner Kleinwort Securities LLC was a registered Primary Dealer for Treasury Securities with the FRBNY.

23.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a New York-based financial services company with its principal place of business at 11 Madison Avenue, 24th Floor, New York, New York 10010. Credit Suisse operates as a subsidiary of Credit Suisse (USA), Inc. Credit Suisse is a registered primary dealer for Treasury Securities with the FRBNY.

24.     Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a New York-based financial services company with its principal place of business at Financial Square, 32 Old Slip, New York, New York 10005. Daiwa operates as a subsidiary of Daiwa Capital Markets America Holdings Inc. Daiwa is a registered primary dealer for Treasury Securities with the FRBNY.

25.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a New York-based investment bank with its principal place of business at 60 Wall Street, 4th Floor, New York, New York 10005. Deutsche Bank operates as a subsidiary of DB U.S. Financial Markets Holding Corporation. Deutsche Bank is a registered primary dealer for Treasury Securities with the FRBNY.

26.     Defendant Goldman, Sachs & Co. ("Goldman") is a New York-based financial services company with its principal place of business at 200 West Street, 29th Floor, New York, New York 10282. Goldman operates as a subsidiary of The Goldman Sachs Group, Inc. Goldman is a registered primary dealer for Treasury Securities with the FRBNY.

27.     Defendant HSBC Securities (USA) Inc. ("HSBC") is a New York-based investment banking firm with its principal place of business at HSBC Tower, 452 Fifth Avenue,

New York, New York 10018. HSBC operates as a subsidiary of HSBC Investments (North America) Inc. HSBC is a registered primary dealer for Treasury Securities with the FRBNY.

28.     Defendant Jefferies LLC ("Jefferies") is a New York-based financial services company with its principal place of business at 520 Madison Avenue, 10th Floor, New York, New York 10022. Jefferies operates as a subsidiary of Jefferies Group LLC. Jefferies is a registered primary dealer for Treasury Securities with the FRBNY.

29.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a New York-based financial services company with its principal place of business at 277 Park Avenue, New York, New York 10172. JPMorgan operates as a subsidiary of JPMorgan Chase & Co. JPMorgan is a registered primary dealer for Treasury Securities with the FRBNY.

30.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a New York-based financial services company with its principal place of business at One Bryant Park, New York, New York 10036. Merrill Lynch operates as a subsidiary of BAC North America Holding Company. Merrill Lynch is a registered primary dealer for Treasury Securities with the FRBNY.

31.     Defendant Mizuho Securities USA Inc. ("Mizuho") is a New York-based financial services company with its principal place of business at 320 Park Avenue, 12th Floor, New York, New York 10022. Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd. Mizuho is a registered primary dealer for Treasury Securities with the FRBNY.

32.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a New York-based financial services company with its principal place of business at 1585 Broadway, New York, New York 10036. Morgan Stanley operates as a subsidiary of Morgan Stanley Domestic

Holdings, Inc. Morgan Stanley is a registered primary dealer for Treasury Securities with the FRBNY.

33.     Defendant Nomura Securities International, Inc. ("Nomura") is a New York-based financial services company with its principal place of business at 309 West 49th Street, Worldwide Plaza, New York, New York 10019. Nomura operates as a subsidiary of Nomura Holding America, Inc. Nomura is a registered primary dealer for Treasury Securities with the FRBNY.

34.     Defendant RBC Capital Markets, LLC ("RBC") is a Canadian financial services company with its principal place of business at Royal Bank Plaza, 200 Bay Street, Toronto, Ontario, Canada ON M5J 2W7. RBC also maintains offices at 3 World Financial Center, 200 Vesey Street, 8th Floor, New York, New York 10281 and at One Liberty Plaza, 165 Broadway, New York, New York 10006. RBC operates as a subsidiary of RBC USA Holdco Corporation. RBC is a registered primary dealer for Treasury Securities with the FRBNY.

35.     Defendant RBS Securities Inc. ("RBS") is a Connecticut-based financial services company with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901. RBS operates as a subsidiary of RBS Holdings USA Inc. RBS is a registered primary dealer for Treasury Securities with the FRBNY.

36.     Defendant SG Americas Securities, LLC ("SG") is a New York-based financial services company with its principal place of business at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020. SG operates as a subsidiary of SG Americas Securities Holdings, LLC, which itself is a subsidiary of Societe Generale Group. SG is a registered primary dealer for Treasury Securities with the FRBNY.

37.     Defendant TD Securities (USA) LLC ("TD Securities") is a New York-based financial services company with its principal place of business at 31 West 52nd Street, New York, New York 10019. TD Securities operates as a subsidiary of TD Holdings II Inc. TD Securities is a registered primary dealer for Treasury Securities with the FRBNY.

38.     Defendant UBS Securities LLC ("UBS") is a Connecticut-based financial services company with its principal place of business at 677 Washington Boulevard, Stamford, Connecticut 06901. UBS operates as a subsidiary of UBS Americas Inc. UBS is a registered primary dealer for Treasury Securities with the FRBNY.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3), on its own behalf and as a representative of all persons or entities who transacted in any Treasury Instrument, excluding Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the U.S. government (the "Class").

40.     While Plaintiff does not know the exact number of the Class members, Plaintiff believes there are at least thousands of Class Members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

41.     Common questions of law and fact exist as to all of the Class.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all of the Class, thereby making appropriate relief with respect to the Class as a whole.  Such common questions of law and fact include, without limitation, the following:

     a.  Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or otherwise manipulate the prices for Treasury Instruments in violation of the Sherman Act and/or Commodity Exchange Act;

     b.   The identity of the participants in the conspiracy;

     c.   The duration of the conspiracy;

     d.   The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

     e.   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class Members;

     f.   Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the Class Members;

     g.   The appropriate injunctive and equitable relief for the Class; and

     h.   The appropriate measure of damages sustained by Plaintiff and the Class Members.

42.    Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and Class Members sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

43.    Plaintiff will fairly and adequately protect the Class Members' interests. Plaintiff is an adequate representative of the Class and has no interests adverse to absent Class Members' interests. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust and commodities class-action litigation.

44.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications.

45.    The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, Class Members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust violations. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

### Treasury Securities Generally

47.     Treasury Securities are debt instruments issued by the Treasury Department ("Treasury Department").   The Treasury Department regularly borrows to finance the Government's debt—$18.5 trillion, as of June 2015—approximately two-thirds of which is held in Treasury Securities, including bills, notes, bonds, Treasury Inflated Protected Securities ("TIPS"), and Floating Rate Notes ("FRNs").  As of June 2015, the Treasury Securities market was estimated to be $12.5 trillion.  On any given day, approximately $500 billion in Treasury Securities change hands.

48.     There are a number of different types of Treasury Securities.  Bills mature in one year or less, are currently offered in 4-, 13-, 26-, and 52-week maturities, do not pay interest prior to maturity, and are sold at a discount to par values.  Cash-management bills ("CMBs") are occasionally offered to meet short-term needs; set on an issue-by-issue basis, they typically run from one day to one year.  CMBs are awarded almost exclusively to Primary Dealers.

Notes mature in 2 to 10 years, are currently offered in 2-, 3-, 5-, 7-, and 10-year maturities, and make a coupon payment every 6 months.  Bonds have the longest maturity, more than 10 years, are currently offered in a 30-year maturity, and make a coupon payment every 6 months.  TIPS are currently offered in 5-, 10-, and 30-year maturities and make a coupon payment every 6 months.  The principal amounts of TIPS are adjusted to the Consumer Price Index, a commonly used measure for inflation.  Therefore, TIPS coupon payments increase when inflation increases and decrease when inflation decreases.  FRNs are currently offered in a 2-year maturity and pay a quarterly coupon that is indexed to the rate of the most-recent 13-week bills offering.  Therefore, FRN coupon payments increase and decrease based on interest-rate movement.

49.     In addition to Treasury Securities themselves, other Treasury Instruments—*i.e.*, derivative financial products based on Treasury Securities—are traded on the Chicago Mercantile Exchange ("CME"), the most common of which are futures and options.  Futures are instruments that obligate the buyer or seller to buy or sell Treasury Securities at a predetermined future date and price; options are instruments that give the holder the right to enter into a specified futures contract with respect to Treasury Securities.  Prices for futures and options are necessarily influenced heavily by prices of the underlying Treasury Securities.

50.     Bought by Primary Dealers, insurance companies, pension and retirement funds, investment funds, foreign accounts, nonprofit organizations, individual investors, and other investors, Treasury Securities are a lynchpin of the U.S. and global financial systems.  The rates attached to the sale of Treasury Securities affect a range of borrowing costs, including home mortgages, auto loans, credit cards, corporate bonds, and state and local bonds.  Treasury Securities are considered to be the most easily traded and trusted debt in the world, and foreign countries convert trillions of dollars of cash into U.S. Treasury Securities every year.

**The Auction Process**

51.    The Treasury Department auctions Treasury Securities to finance the debt of the U.S. government.  While the specific details vary based on the type of Treasury Security up for auction, Treasury Securities auctions are conducted regularly and predictably.  The Treasury announces the auction at least several days in advance, along with the amount of Treasury Securities up for auction, the issue or original issuance date, the maturity date, the terms and conditions of the offering, the customers eligible to participate, noncompetitive and competitive bidding time, and other relevant information.

52.    Bids may be submitted, as soon as an auction is announced, primarily through the Treasury Automated Auction Processing System ("TAAPS"), although a smaller volume of Treasury Securities is purchased by individual investors directly from the Treasury Department through its TreasuryDirect website.  Investors without access to either TAAPS or TreasuryDirect can bid through broker-dealers or through depository institutions that have access to TAAPS.

53.    There are two types of bids: non-competitive and competitive.  Noncompetitive bids are generally submitted by small investors and individuals who agree to accept the rate, yield or discount margin that is determined at the auction.  Non-competitive bids are guaranteed to receive Treasury Securities, although the amount is limited to $5 million per auction per single bidder.

54.    Competitive bids, by contrast, are usually submitted by large financial institutions, typically Primary Dealers, for their own accounts or for their customers.  Unlike non-competitive bids, competitive bids specify the rate, yield, or discount margin that the bidder will accept.  Competitive bidders are restricted to receiving no more than 35% of the

total amount of Treasury Securities being auctioned to ensure that the secondary market for Treasury Securities remains competitive.  Many of the Treasury Securities bought by Primary Dealers are later sold and resold on the secondary market to companies, banks, other dealers, and individuals.  Given their large bid size, Primary Dealers typically submit their competitive bids at the last possible moment—sometimes literally seconds before the auction closes.

55.     Once an auction is complete, TAAPS processes all of the bids received to determine the winning price.  The Treasury sells Treasury Securities to the public through single-price auctions, where both successful competitive and noncompetitive bidders buy securities at a price that equals the highest accepted rate, regardless of the rate or yield that they submitted.  The detailed list of accepted and rejected competitive bids is not released to the public, but the total amount of bids received and total amounts accepted are made available after auctions.  Additionally, the high, low, and median accepted rates and details on the composition of auction bidders are released to the public after auctions.

56.     To determine the winning price, TAAPS first subtracts non-competitive bids from the public-offering amount to determine the amount of securities available to competitive bidders.  Since Treasury auctions are designed to minimize the cost of financing the national debt, TAAPS then works its way down the list of competitive bids and accepts the total amount submitted at the lowest possible bid yields until the full offering amount has been awarded.

57.     As an example, in an $11-billion auction, if $1 billion in non-competitive bids is received, then $10 billion in Treasuries will be awarded to competitive bidders.  In this example, six separate entities submitted competitive bids into the auction at the rates below.

| NAME | YIELD | AMOUNT |
|------|-------|--------|
| Bidder 1 | 2.998% | $3.5 billion |
| Bidder 2 | 2.999% | $2.5 billion |
| Bidder 3 | 3.000% | $3.0 billion |
| Bidder 4 | 3.000% | $3.0 billion |
| Bidder 5 | 3.001% | $2.0 billion |
| Bidder 6 | 3.002% | $1.0 billion |

58.     Then, TAAPS works its way down the list of competitive bids and accepts the total amount submitted at the lowest possible bid yields until the full offering amount has been awarded.

| | |
|---|---|
| Competitive Offering | $10,000,000,000 |
| Bidder 1 @ 2.998% (*lowest yield*) | − 3,500,000,000 |
| REMAINING COMPETITIVE OFFERING | $6,500,000,000 |
| Bidder 2 @ 2.999% (*next lowest*) | − 2,500,000,000 |
| REMAINING COMPETITIVE OFFERING | $4,000,000,000 |

59.     At this point, there is $4 billion remaining for competitive bidding.  However, there is a total of $6 billion in bids at the next lowest rate (3.000%).  The highest accepted rate (3.000%) is known as the stop-out rate.  When this occurs, each bidder at this rate is awarded a percentage of their total bid amount.  The allocation percentage is calculated by dividing the remaining competitive offering by the total amount bid at the stop-out rate.

$$\frac{\text{Remaining Competitive Offering}}{\text{Total Bids at Stop-Out Rate (3.00\%)}} = \frac{\$4,000,000,000}{\$6,000,000,000} = 66.7\%$$

60.     In this example, Treasury Securities would be awarded to the first four bidders only.  Bidder 1 and Bidder 2 would each be awarded in full, whereas Bidder 3 and Bidder 4 would each receive a partial allocation of $2 billion (66.67% x $3.0 billion bid).

| NAME | YIELD | AMOUNT BID | AMOUNT AWARDED | ALLOCATION PERCENTAGE | RATE AWARDED |
|------|-------|------------|----------------|-----------------------|--------------|
| Bidder 1 | 2.998% | $3.5 billion | $3.5 billion | 100% | 3.00% |
| Bidder 2 | 2.999% | $2.5 billion | $2.5 billion | 100% | 3.00% |
| Bidder 3 | 3.000% | $3.0 billion | $2.0 billion | 66.67% | 3.00% |
| Bidder 4 | 3.000% | $3.0 billion | $2.0 billion | 66.67% | 3.00% |
| Bidder 5 | 3.001% | $2.0 billion | $0 | 0% | N/A |
| Bidder 6 | 3.002% | $1.0 billion | $0 | 0% | N/A |

**The When-Issued Market**

61.     After an auction has been announced, a Primary Dealer that plans to purchase Treasury Securities at the auction may first sell Treasury Securities to its customers and then buy Treasury Securities at the auction to cover these sales, pocketing the difference in sale and purchase price, or spread, as profit.  Trading activity during this period, along with the days between the close of the auction and issuance of Treasury Securities, is known as the "when-issued market."

62.     Primary Dealers and their counterparties in the when-issued market place buy or sell orders with one another reflecting their expectations that Treasury Securities will either (i) fall in value, in which case the Primary Dealer or counterparty will take a "short" position and agree to deliver Treasury Securities, or (ii) rise in value, in which case the Primary Dealer will take a "long" position and agree to take delivery of Treasury Securities.  Accordingly, a Primary Dealer that takes a short position with respect to Treasury Securities during the when-

issued market will thus only make a profit on the trade if the Primary Dealer can subsequently obtain Treasury Securities at auction (or on the secondary market) at a lower price than the price at which the Primary Dealer agreed to sell it to a counterparty.

63.     In a truly competitive market, because prices of Treasury Securities are generally lower in the when-issued market than at auction, Primary Dealers may have difficulty profiting on short positions.  Consequently, the Treasury Department auctions Treasury Securities to Primary Dealers at a discount, so that the Primary Dealers can make a profit selling, and thus have an incentive to sell, to counterparties.

**The Role of Primary Dealers**

64.     Primary Dealers are the largest group of buyers at Treasury Securities auctions and are active in buying and selling U.S. Government securities.  They are either (i) U.S.-chartered banks (commercial banks, thrifts, national banks, or state banks) subject to official supervision by bank supervisors or (ii) broker-dealers registered with and supervised by the SEC.  Primary Dealers serve as trading counterparties of the FRBNY in its implementation of monetary policy and are required to participate in all Treasury Securities auctions and to make reasonable markets for the FRBNY when it transacts on behalf of its foreign official account-holders.  Many of the Treasury Securities bought by Primary Dealers at auctions will later be sold and resold on the secondary market to companies, banks, other dealers, and individuals.  Accordingly, Primary Dealers form a worldwide network that distributes new U.S. government debt.

65.     The FRBNY mandates that in every Treasury Securities auction, each Primary Dealer bids for—at a minimum—an amount of securities representing its pro rata share of the offered amount, based on the number of Primary Dealers at the time of the auction, and that a

Primary Dealer's bid prices should be reasonable when compared to the range of rates trading in the when-issued market, taking into account market volatility and other risk factors. The FRBNY expects Primary Dealers to act as responsible counterparties and market participants in their overall support of market efficiency and liquidity. Finally, the FRBNY expects a Primary Dealer to maintain robust compliance programs, including procedures to identify and mitigate legal, regulatory, financial, and reputational risks.

66.     As purchasers of Treasury Securities both on their own behalf and on behalf of third parties, the handful of institutions that serve as Primary Dealers are, collectively, in a unique, privileged position with respect to their access to order information for an issuance of Treasury Securities.

67.     Nonetheless, the market for Treasury Securities is only lightly regulated. Various financial regulators oversee only parts of the U.S. Treasuries market, though not the whole. The Treasury Department has the authority to write rules, though not to enforce them. The SEC can enforce these rules through its oversight over broker-dealers that transact in Treasury Securities, though only when they are alerted to unusual trading behavior. Moreover, Treasury Securities are exempt from being defined as a security under the federal securities laws. And the NYFRB monitors the Treasury Securities market only in relation to its decisions on monetary and fiscal stability policy. So although Primary Dealers are subject to rules by the Treasury Department and the FRBNY, neither entity has enforcement power. Several Primary Dealers belong to the Treasury Market Practices Group ("TMPG"), which issues best practices, compliance, and ethical guidelines, but likewise lacks any enforcement power with respect to its members' activities.

68.     Indeed, executives from three large Primary Dealers, who asked for anonymity, have already warned that this lack of cohesive regulation, along with insufficient technology for monitoring, has made the Treasures market more dangerous.[1]

69.     Under-regulated and dominated as it is by a handful of institutions, the market for Treasury Securities is particularly susceptible to collusion and manipulation.  Professor James Cox of Duke University School of Law, an expert on financial markets, stated in *Bloomberg Business* that in "the Treasury market, where you have a small number of participants and the sales volume is very high, it is a fertile area for harmful collusive behavior[.]"  Likewise, Mark MacQueen of Sage Advisory Services Ltd., formerly a bond trader at Merrill Lynch, described Primary Dealers as "an insiders club where they're supposed to have more information[.]"  Indeed, several people familiar with the operations of the Primary Dealers have said that although many financial institutions have guidelines prohibiting employees from discussing client-bid information before Treasury Securities auctions, these guidelines are not followed, monitored, nor enforced in many cases.[2]

### NATURE OF DEFENDANTS' UNLAWFUL CONDUCT

**Defendants Collude to Manipulate Price Levels for Treasury Securities at Treasury Department Auctions and in the When-Issued Market**

70.     Throughout the Class Period, Defendants abandoned their collective, privileged responsibility as market-makers for U.S. Government debt by engaging in systemic collusion aimed at manipulating the market for Treasury Securities.  By exchanging confidential customer information with one another, Defendants were able to coordinate their trading

---

[1] *See* Keri Geiger and Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, BLOOMBERG BUSINESS, June 10, 2015; Matthew Leising and Alexandra Scaggs, *Don't Spoof $12.6 Trillion Treasury Market, Fed Group Says*, BLOOMBERG BUSINESS, April 9, 2015; Matthew Leising, *If Treasuries are Manipulated, Good Luck Finding any Cops*, BLOOMBERG BUSINESS, December 8, 2014.
[2] Keri Geiger, Daniel Kruger, and Alexandra Scaggs, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk is a Good Place to Start*, BLOOMBERG BUSINESS, June 24, 2015.

strategies: (i) first to artificially inflate prices of Treasury Securities they sold to customers in the when-issued market; and (ii) subsequently to manipulate Treasury Securities auction bidding to artificially deflate the prices at which they purchased Treasury Securities to cover orders placed pre-auction in the when-issued market.  Consequently, Defendants were able to maximize, through collusion and at expense of the Class, their own profits, while damaging investors in Treasury Securities and other Treasury Instruments.

71.     On or around June 8, 2015, the media reported that the DOJ's Antitrust Division was probing Primary Dealers for potential collusion in setting prices for Treasury Securities, including whether information was being shared improperly in submitting competitive bids.[3]

72.     On June 24, 2015, Bloomberg Business reported that, hours ahead of auctions of Treasury Securities, traders at Primary Dealers obtained detailed information from Primary Dealers' salespeople about billions of dollars worth of bids by their clients.[4]  Similarly, traders at Primary Dealers frequently exchanged information with their counterparts at other Primary Dealers regarding their clients' orders for Treasury Securities through online chat rooms.  By "swapp[ing] gossip about clients' Treasury [Securities] orders," traders at primary dealers "gained information useful for making bets on one of the most powerful drivers of global markets."[5] This collusion among Prime Dealers enabled them to take positions in the Treasury Securities market that often swayed prices of trillions of dollars in bonds, including corporate bonds, at the expense of the Class.

---

[3] *See, e.g.*, Kevin Dugan, *Justice Department Probes Banks for Rigging Treasuries Market*, NEW YORK POST, June 8, 2015; Owen Davis, *Banks Probed Over Treasury Market Manipulation*, INTERNATIONAL BUSINESS TIMES, June 8, 2015; Keri Geiger and Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, BLOOMBERG BUSINESS, June 10, 2015.

[4] Keri Geiger, Daniel Kruger, and Alexandra Scaggs, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk is a Good Place to Start*, BLOOMBERG BUSINESS, June 24, 2015.

[5] *Id.*

## CERTAIN DEFENDANTS HAVE A HISTORY OF COLLUDING TO MANIPULATE FINANCIAL MARKETS

73.     Indeed, the DOJ's investigation comes on the heels of recent settlements among financial institutions—many of which are Primary Dealers—and regulators regarding similar collusion in other weakly regulated markets.  As Professor Jill E. Fisch of the Institute for Law and Economics at the University of Pennsylvania Law School observed in a *Bloomberg Business* article, "the government is in a strong position thinking that where there's smoke, there's fire. . . . It's not just one investigation after another, it's one scandal after another."[6]

74.     In May 2015, the DOJ, in conjunction with non-DOJ regulators, extracted an unprecedented string of guilty pleas from major financial institutions for violating federal antitrust laws by colluding, for over five years, to rig the $5.3 trillion-a-day foreign-exchange benchmarks at the global economy's center.[7]  The DOJ has so far recovered more than $10 billion in fines from financial institutions, including approximately $2.38 billion from Barclays Plc, $1.27 billion from Citigroup, $892 million from JPMorgan Chase & Co., $669 million from The Royal Bank of Scotland Plc, and $545 million from UBS AG.[8]  Traders at these banks met regularly in electronic chat rooms minutes before global currency benchmarks were set to swap confidential information, including details about their customers' orders.[9]  Using names such as "The Cartel" and "The Mafia," the groups colluded to place last-minute trades that would move rates in ways profitable to them.[10]  This investigation is ongoing against several conspirators.  JPMorgan Chase & Co. has already settled out of the related antitrust

---

[6] Keri Geiger and Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, BLOOMBERG BUSINESS, June 10, 2015.
[7] Owen Davis, *Major Banks Slapped With $5.7 Billion in Fines, Unprecedented Criminal Charges Over Foreign Exchange Manipulation*, INTERNATIONAL BUSINESS TIMES, May 20, 2015.
[8] *Id.*
[9] *Id.*
[10] *Id.*

class action for approximately $100 million.[11]  Predominantly all of the defendants in this class action are Primary Dealers.

75.     Also in May 2015, the U.S. Commodity Futures Trading Commission ("CFTC") settled with Barclays Plc. for $115 million for allegations that it attempted to rig ISDAFIX, a benchmark for interest-rate swaps, over five years.[12]  ISDAFIX is calculated daily at a specific time based on banks' quotations for the rate at which they would buy or sell a reference swap of a specific nominal value.  Traders at Barclays Plc. were implicated in a scheme to buy or sell heavily immediately before ISDAFIX's daily calculation with the goal of moving the rate in a desired direction.  This investigation remains ongoing against several conspirators in the financial industry.

76.     In April 2015, Deutsche Bank settled with several U.S. and international regulators for $2.5 billion over alleged collusion with respect to LIBOR.[13]  Calculated daily by a banking-trade-association panel based on banks' submissions of rates intended to reflect their anticipated cost of borrowing U.S. dollars from other banks, LIBOR is a crucial daily interest-rate benchmark in financial markets.  Deutsche Bank, along with several other Defendants or affiliates of Defendants in this action—Barclays Plc., The Royal Bank of Scotland, and UBS AG—was implicated in an intra-bank conspiracy to report rates that did not reflect good-faith estimates of their borrowing costs, submitting instead artificial rates over the course of nearly three years to fix LIBOR at a rate that would benefit these Defendants at the expense of their counterparties.

---

[11] Jonathan Stempel, *JPMorgan Settles Currency Manipulation Lawsuit in U.S.*, REUTERS, Jan. 5, 2015.
[12] Matthew Leising, *The E-Mail That Helped Catch Barclays: 'ISDAfix Is Manipulated'*, BLOOMBERG BUSINESS, MAY 20, 2015.
[13] Dean Starkman, *Deutsche Bank Settles Libor Manipulation Investigation for $2.5 Billion*, LOS ANGELES TIMES, April 23, 2015.

77.     The recent flurry of guilty pleas and settlements in connection with the conspiracies described above were overwhelmingly from entities connected to Primary Dealers.

**DEFENDANTS FRAUDULENTLY CONCEALED THEIR MISCONDUCT**

78.     Defendants and their co-conspirators concealed their wrongdoing in manipulating the prices of Treasury Securities in the when-issued market and at the Treasury Department auctions. Thus, the statute of limitations relating to the claims for relief alleged below was tolled due both to Defendants' and their co-conspirators affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

79.     Defendants' and their co-conspirators' success in concealing their collusion was facilitated by their tremendous control over the market for Treasury Securities by virtue of their positions as Primary Dealers in this market.

80.     Neither Plaintiff nor Class Members knew of Defendants' and their co-conspirators' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports disclosing DOJ's investigation of the Treasury Securities market. Plaintiff and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date. Indeed, Defendants' and their co-conspirators' conduct concerning their manipulation was so well hidden that Defendants and their co-conspirators kept U.S. regulators unaware of such conduct for years.

81.     Only after recent public reports disclosed DOJ's investigation of the Treasury Securities market did Plaintiff have a sufficient basis to investigate possible manipulation of the Treasury Securities market by Defendants and their co-conspirators.

82.     Reasonable due diligence could not have uncovered Defendants' and their co-conspirators' manipulative conspiracy because of the following, without limitation: (i) the

Treasury Department auctions were held out as being set by an impartial auction based on market factors; (ii) Defendants' bids in the Treasury Department auctions are secret and not publicly available; (iii) Defendants' and their co-conspirators' trading positions and trading strategies in the when-issued market are not publicly available; (iv) the bilateral, non-exchange traded nature of when-issued market transactions make observing anticompetitive and/or manipulative behavior in that market exceedingly difficult; (v) the highly specialized and esoteric nature of the different aspects of the Treasury Securities market makes it extraordinarily difficult for an ordinary person to assess improprieties; and (vi) neither Defendants nor their co-conspirators told Plaintiff or other Class Members that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the prices of Treasury Securities during the when-issued market or at the auctions.

83.     Defendants and their co-conspirators also took active steps to conceal evidence of their misconduct from Plaintiff, the Class, regulators, and the public, including, among other things: (i) holding out their activities in the when-issued market and at auction as good faith market-making conduct; (ii) maintaining the secrecy of their price-fixing scheme; (iii) avoiding any discussion in public fora of their collusive activities and manipulation of the when-issued market and Treasury Department auctions; and (iv) using non-public proprietary electronic communication platforms—for example, instant messaging, electronic chatrooms, etc.—to coordinate trading strategies in the when-issued market and auction behavior.

84.     In addition, Defendants and their co-conspirators also failed to have the proper internal controls in place to detect misconduct concerning the manipulation of Treasury Securities. Such internal failures made it all the more difficult for Plaintiff, the Class,

government regulators, and the public to become aware of Defendants' and their co-conspirators misconduct.

85.     As a result of Defendants' and their co-conspirators' affirmative steps to conceal their improper conduct, their willful decision not to put in place proper controls to detect improper conduct, the self-concealing nature of the price-fixing conspiracy, and the resulting lack of public information about material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations was tolled for Plaintiff's claims.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF 15 U.S.C. § 1 – AGREEMENT RESTRAINING TRADE**

86.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

87.     Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

88.     During the Class Period, Defendants entered into an agreement to reduce competition amongst themselves by fixing and/or manipulating Treasury security prices before and during Treasury auctions and, as a result, the prices of Treasury Securities.

89.     This conspiracy to manipulate Treasury Securities prices and the benchmark price caused injury to both Plaintiff and the Class by depriving them of the benefit of accurate Treasury Securities prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

90.     The conspiracy is *a per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the Treasury markets. There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of Defendants' conduct.

91.     As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

92.     Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein. Plaintiff and the Class are also entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 7 U.S.C. §§ 1 *et seq.*
## MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, INCLUDING CFTC RULE 180.2

93.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

94.     By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(3) and 9(a)(2) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 9(3), 13(a)(2), and CFTC Rule 180.2 adopted under the CEA ("Rule 180.2") and caused prices of exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options to be artificial during the Class Period.

95.     Defendants' and their co-conspirators' trading and other activities alleged herein constitute market power manipulation of the prices of exchange-traded Treasury futures and

options and over-the-counter Treasury forwards and options in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), and Rule 180.2.

96.     Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

97.     Plaintiff and others who transacted in exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulation in violation of the CEA, 7 U.S.C. § 1, *et seq.,* and Rule 180.2, and as a direct result thereof were injured and suffered damages. Plaintiff and each Class Member sustained and are entitled to actual damages for the violations of the CEA alleged herein.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF 7 U.S.C. §§ 1 *et seq.***
**EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR**
**CONTRIVANCE IN VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**INCLUDING CFTC RULE 180.1**

98.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

99.     By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(1) and 9(a)(2) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 9(1), 13(a)(2), and Rule 180.1 and caused prices of exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options to be artificial during the Class Period.

100.     Defendants' and their co-conspirators' trading and other activities alleged herein constitute market power manipulation of the prices of exchange-traded Treasury futures and

options and over-the-counter Treasury forwards and options in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), and Rule 180.1.

101.    In violation of CEA Section 6(c)(1) and Rule 180.1 Defendants and co-conspirators also caused to be delivered for transmission false or misleading or inaccurate reports in connection with the Treasury Department auctions by fixing the bids during these auctions, thereby causing them to reflect artificial, non-competitive pricing for these securities. Defendants and co-conspirators did so either knowingly, intentionally, or acting in reckless disregard of the fact that such reports were false, misleading, or inaccurate. Defendants also violated CFTC Rule 180.1 by deceiving their customers in the when-issued market through the sale of price-fixed when-issued Treasury Securities. Customers in the when-issued market had a reasonable expectation that the prices of when-issued Treasury Securities are reflective of natural market forces. By selling price-fixed Treasury Securities to their unwitting customers, Defendants undermined their customers' reasonable expectations of a fair marketplace free from manipulation and collusion.

102.    Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

103.    Plaintiff and others who transacted in exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq.,* and Rule 180.1, and as a direct result thereof were injured and suffered damages. Plaintiff and each Class Member sustained and are entitled to actual damages for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF 7 U.S.C. §§ 1 *et seq.* PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

104.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

105.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

106.    Plaintiff and each Class Member are entitled to actual damages for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF 7 U.S.C. §§ 1 *et seq.*
## AIDING AND ABETTING LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

107.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

108.    Defendants and their co-conspirators knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's and their co-conspirators' manipulation of the Treasury Securities market, and willfully intended to assist these manipulations, which resulted in Treasury futures and options pricing becoming artificial during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

109.    Plaintiff and each Class Member are entitled to actual damages for the violations of the CEA alleged herein.

## SIXTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT

110.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

111.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

112.    Permitting Defendants to retain profits earned by manipulation of the Treasury Securities market would violate established principles of equity and good conscience.

113.    Plaintiff and Class Members transacted in Treasury Securities directly with Defendants in the when-issued market. By virtue of Defendants' manipulation of these when-issued Treasury Securities, Plaintiff and Class Members were deprived the benefits of a fair market, free from collusion and manipulation. Defendants reaped millions of dollars in profits at the expense of Plaintiff and Class Members as result of their misconduct.

114.    Furthermore, the Treasury derivatives market, which includes Treasury futures and options, are effectively a zero-sum game, meaning that when one individual gains money in a particular transaction, another must lose money on that same transaction. As a direct and foreseeable consequence of Defendants' manipulation of the Treasury Securities market, Defendants were able reap millions of dollars in profits at the expense of Plaintiff and Class Members, who sold Treasury Securities, including Treasury futures and options traded on the CME.

115.    Accordingly, Plaintiff and the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein, by way of transactions for the sale or purchase of Treasury Securities entered into with Defendants or their co-conspirators.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     The Court determine that this action may be maintained as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), appoint Plaintiff as a Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class;

B.     The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed:

(i)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

(ii)     A *per se* violation of Section 1 of the Sherman Act;

C.     Plaintiff and the Class recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.     The Court determine that Defendants violated the CEA and award appropriate damages;

F.     Plaintiff and the Class be awarded pre- and post-judgment interest as provided by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated:  July 29, 2015

**POMERANTZ LLP**

*s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Justin S. Nematzadeh
J. Alexander Hood II
C. Dov Berger
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
jnematzadeh@pomlaw.com
ahood@pomlaw.com
cdberger@pomlaw.com

**POMERANTZ LLP**
Jayne A. Goldstein
1792 Bell Tower Lane, Suite 203
Weston, Florida 33326
Telephone:  (954) 315-3454
Facsimile:  (954) 315-3455
jagoldstein@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

*Counsel for Plaintiff*

34